IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

SHIRLEY M. JOHNSON,

Plaintiff,

vs.

CARL D. KING,

Defendant.

Case No. 10-CV-279-S

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This breach of contract action is brought by Plaintiff Shirley M. Johnson against Defendant

Carl D. King, alleging the breach of a promissory note and a mutual release of claims entered into

by the parties in June 2008. Defendant counterclaims by alleging that Plaintiff engaged in fraud and

misrepresentation in the execution of the promissory note and mutual release, entitling him to a set-

off of his obligations under the promissory note. Defendant defends against Plaintiff's breach of

contract claims by arguing that the contracts at issue fail for lack of consideration and are void and

unenforceable due to illegality, fraud, and Plaintiff's breach of fiduciary duties.

Now pending before the Court is Plaintiff's Motion for Summary Judgment [Doc. 67].

Plaintiff asserts that King has no valid defenses and counterclaims to enforcement of the $1.5 million

Promissory Note he executed on June 1, 2008, entitling Johnson to judgment as a matter of law on

the outstanding balance.  King responds by arguing that genuine issues of material fact remain which preclude the grant of summary judgment.  In the alternative, King moves pursuant to Fed. R. Civ. P. 56(d) for additional time to conduct discovery relating to his affirmative defenses, and further moves this Court to compel certain discovery responses related to his affirmative defense.  The Court, having reviewed Plaintiff's motion and the memoranda in support and opposition thereto, having heard oral argument, and considering itself otherwise fully advised, hereby FINDS and ORDERS as follows:

## FACTUAL BACKGROUND

At the heart of this dispute is a gas station, convenience store, and motel known as the Flat Creek Inn and Mart, located directly across from the National Elk Refuge in Jackson Hole, Wyoming.  Until 2004, this business was operated by an entity known as Johnson Amusement Parks West (JPAW), which, in turn, was owned by an entity known as Johnson Amusement Parks (JAP).  JAP was owned by two brothers, Melvin and Arlyn Johnson, with each owning a 50% share of the company.

A.      Shirley Johnson and Arlyn Johnson

The plaintiff in this matter, Shirley Johnson, is the ex-wife of Arlyn Johnson.  Arlyn and Shirley[1] divorced in 1998, and as part of their divorce settlement, Plaintiff was awarded a 50%

_____

[1] Because several of the individuals relevant to the factual background of this case share the same last name, the Court occasionally refers to them by their first names.  This process is employed for the sake of clarity and is not intended in any way to accord any lesser degree of

interest in a promissory note from JPAW. In fulfillment of this term of the Divorce Decree, JPAW executed a new promissory note payable directly to Plaintiff in the amount of $266,500.00. In the division of additional assets of the marital estate, Plaintiff was awarded a promissory note from Arlyn Johnson, personally, in the amount of $1,158,715.00.

Arlyn Johnson died in November 2004. By virtue of the outstanding promissory note Plaintiff had from Arlyn Johnson, Plaintiff became a significant creditor of Arlyn's Estate. The Estate was administered in the Ninth Judicial District Court in and for the Teton County, Wyoming, and Plaintiff filed a timely claim in that matter.

B.     Carl King, Melvin Johnson and CDK, Inc.

Defendant Carl King's entanglement with the Johnson family began, according to his own account, shortly after Arlyn's death, in the parking lot of the Flat Creek Inn and Mart. According to Defendant Carl King, this is where, sometime at the end of November 2004, he first met Arlyn's brother, Melvin. Although the record does not reveal just exactly how Melvin and King's relationship evolved from a parking lot encounter to a business association, in January 2005, King was named the Chief Financial Officer of the Flat Creek Inn and Mart and began operating the business. (Dfdt.'s First Amended Answer Affirmative Defenses & Counterclaim ("Answer"), ¶ 47.) At some point in 2005, Melvin offered to sell King his interest in the Flat Creek Inn and Mart.

_____

respect to any individual involved in this dispute.

Unfortunately, the precise ownership structure of the family businesses appears to have been lost on Melvin.  Believing his ownership interest in the Flat Creek Inn and Mart was represented by a 50% ownership interest in JPAW, Melvin offered and ultimately purported to sell a 50% interest in JPAW to King in August 2005.   In fact, however, as set forth above, JPAW, d/b/a the Flat Creek Inn and Mart, was a wholly-owned subsidiary of JAP, which, in turn, was owned 50% by Melvin Johnson and 50% by the Estate of Arlyn Johnson.

King purchased Melvin's interest in JPAW for "approximately 50 to 100 thousand" dollars cash, along with a promissory note entitling Melvin to recoup all monies already owed to him by JPAW.  This cash payment to Melvin Johnson was made in April or May 2005, but the documents accomplishing the sale were finalized in August 2005. (King Depo. at 20.)  According to King, the entire purchase price for Melvin's 50% share of JPAW was "approximately 700, 750 thousand [dollars]," which represented the cash payment of fifty or one hundred thousand dollars coupled with an obligation to pay  JPAW's outstanding loan obligations to Melvin.  (King Depo. at 20, 22-23.)

In August 2005, King changed the name of JPAW to CDK, Inc. ("CDK").  The issue regarding the actual ownership of CDK f/k/a JPAW by JAP first came to light sometime later in the fall of 2005.

C.      Teton County Litigation - *CDK v. Michael Cramer* and *Shirley Johnson v. CDK*

In October 2005, CDK filed suit against the personal representative of Arlyn Johnson's

4

Estate in the Ninth Judicial District in and for Teton County, Wyoming. By way of that lawsuit, entitled *CDK, Inc. v. Michael J. Cramer*, Civil No. 13669, CDK sought to recover on loans totaling $1,036,113.79 owed to CDK f/k/a JPAW by Arlyn Johnson at the time of his death. (Complaint, *CDK, Inc. v. Michael J. Cramer*, Ninth Judicial District, Teton County, Wyoming, Civil No. 13669, King Depo. Ex. 1.) Because the statutory time period for filing a claim against the Estate had already expired, CDK brought its claim in a separate lawsuit seeking permission to file a late claim under Wyo. Stat. § 2-7-703(c)(i). CDK alleged that King had only learned of Arlyn's outstanding indebtedness to CDK after he purchased an interest in CDK and financial documents were received from Joe Schilz, the accountant responsible for the books of JPAW n/k/a CDK. (*Id.*, ¶¶ 9-10.) CDK argued that it should be allowed to pursue its untimely claim against the Estate of Arlyn Johnson on the basis of King's belief that "financial documents were intentionally withheld from him during the negotiation and diligence period." (*Id.*, ¶¶ 13-17.)

In November 2005, Shirley Johnson initiated a lawsuit against CDK and JPAW in the Ninth Judicial District Court in and for Teton County, Wyoming. (Complaint, *Shirley Johnson v. CDK, Inc. et al.*, Ninth Judicial District, Teton County, Wyoming, Civil No. 13717, Pl. Ex. B.) In that case, Shirley Johnson alleged that CDK and JPAW owed her the outstanding balance on the $266,500 promissory note issued to her pursuant to her divorce decree. Plaintiff asserted that the last payment under the note had been made by JPAW in January 2004. She sought recovery of the outstanding principal balance in the amount of $222,983.55 along with accrued interest

from January 15, 2004 at the rate of seven percent per annum.

>        D.        Carl King's Purchase of 50% of JAP from Melvin Johnson

On July 22, 2007, to clear up issues regarding the ownership of the Flat Creek Inn and Mart business (CDK f/k/a JPAW), Melvin Johnson sold his 50% interest in JAP to Carl King. (Sale of Stock of Jhonson [sic] Amusement Parks, Inc., King Depo. Ex. 5.) This stock purchase agreement was intended to accomplish the "previous attempted sale of JPAW, Inc." and to remedy the problems associated with Melvin's apparent misunderstanding regarding the actual corporate ownership of the Flat Creek Inn and Mart. (*Id.*, ¶ 1.) In the recitals of this stock purchase agreement, the parties noted that "[Melvin] Johnson previously attempted to sell his interest in CDK, Inc., formerly known as JPAW, Inc. a Wyoming corporation to Carl King" and further that "[t]hat transaction was called into question based on the reasoning that [Melvin] Johnson did not personally own stock in JPAW, Inc. as JPAW, Inc. was a wholly owned subsidiary of JAP, Inc." (*Id.,* Recitals ¶¶ e-f.) Pursuant to the stock purchase agreement, Melvin Johnson agreed to transfer his 50% of the common stock of JAP to King, subject to certain terms and conditions. (*Id.*, Recital ¶ d.) In particular, Paragraph 5 of the stock sale agreement provided as follows:

>    Disgorgement of Profits. In conjunction with this transfer of interest, Carl King agrees to disgorge his share of any distribution of JAP, Inc. realized from the operation or sale of any assets of JAP, Inc. with the exception of any profits realized from the operation or sale of CDK, Inc. formerly known as JPAW, Inc. or from the operation or sale of the Flat Creek Inn & Mart located in Jackson, Wyoming.

(*Id.*, ¶ 5.)  As a result of the stock sale agreement, Carl King owned fifty percent of JAP (subject to the above-referenced provision), and the Estate of Arlyn Johnson owned the remaining fifty percent.

      E.      <u>The 2007 Settlement Agreement</u>

      On November 4, 2007, Shirley Johnson, CDK, and Carl King, along with two other beneficiaries of the Estate of Arlyn Johnson,[2] entered into a Settlement Agreement and Release ("2007 Settlement Agreement" or "the Agreement") seeking to resolve all disputes pending between them.  The 2007 Settlement Agreement was conditioned upon approval by the probate court administering the Estate of Arlyn Johnson.[3]  The claims encompassed by the Agreement included the individual claims of Shirley, Pamela and Michael Johnson against the Estate of Arlyn Johnson, Shirley Johnson's litigation against CDK for the $266,500 promissory note, and CDK's claim against the Estate for the balance of Arlyn's loans from CDK f/k/a JPAW.  Pursuant to the 2007 Settlement Agreement, upon receipt of JAP's common stock from the Estate, Shirley Johnson agreed to distribute 100% of the common stock of CDK to Carl King,

---

     [2] The other beneficiaries who were a party to the 2007 Settlement Agreement were Pamela K. Johnson and Michael J. Johnson, the children of Arlyn and Shirley Johnson.

     [3] Approval of the probate court was required because the Agreement contemplated specific action with respect to the distribution of Estate assets.  In particular, the Agreement contemplated the transfer of 50% of JAP's stock to Shirley Johnson.  (2007 Settlement Agreement, ¶ 2.)  In addition, the Agreement contemplated assignment of the defense of CDK's claim against the Estate to Shirley Johnson.  (*Id.*)

and contemporaneously with that transaction, Carl King agreed to transfer 50% of the issued and outstanding stock in JAP to Shirley Johnson.  (2007 Settlement Agreement, ¶¶ 3.1-3.2.)  In exchange for full ownership of CDK, King further agreed to pay Shirley Johnson $1.5 million by cashier's check or wire transfer contemporaneously with the various stock transfers.  (*Id.,* ¶ 3.3.)

      F.      <u>Settlement of the Probate Action</u>

In December 2007, the various claimants in the probate action entered into a Settlement and Distribution Agreement ("the Estate Agreement") proposing an agreed-upon distribution of the assets of Arlyn Johnson's Estate.  These assets were identified in Exhibit B to the Estate Agreement, which was incorporated and made a part of the Agreement by reference. (Estate Agreement at 1.)  Under the heading, "Resolution of SMJ [Shirley M. Johnson] Claim," the parties to the Estate Agreement agreed that JAP held certain real property interests in Sister Bay, Wisconsin.  (Estate Agreement at § 1.01(a)(1).)  More specifically, Section 1.01(a)(1) identified with particularity two vacant lots owned by JAP in Sister Bay, Wisconsin.[4]  Section 1.01(a)(1) neglected to identify with particularity an improved commercial lot (an amusement park) owned by JAP in Sister Bay, Wisconsin.

Nonetheless, Exhibit B to the Estate Agreement listed the following property under the

---

[4] Four parcels of land were actually identified with particularity under this Section; however, two of the listings were duplicate descriptions of the same property.  The description of Parcel 1 and Parcel 4 under Section 1.01(a)(1) of the Estate Agreement identify the same, single vacant lot, as do the descriptions of Parcel 2 and Parcel 3. (Geittman Aff., ¶¶ 13-14.)

asset listing for Arlyn Johnson's "50% Equity Interest in Johnson Amusement Parks, Inc.":

| 50% Equity Interest in Johnson Amusement Parks, Inc. | Probate Value | Estate Tax Value |
|---|---|---|
| *Vacant Real Estate Sister Bay, Wisconsin (Assessed Value)* | $80,400.00 | $80,400.00 |
| *Sister Bay, Wisconsin Amusement Park (Assessed Value)* | $800,700.00 | $800,700.00 |

According to the Estate's lawyer, the "Vacant Real Estate" identified on Exhibit B refers to the two vacant lots identified in Section 1.01(1)(a) and the listing for the "Sister Bay, Wisconsin Amusement Park" refers to the improved commercial lot (amusement park) that was not separately listed under Section 1.01(1)(a).

On January 16, 2008, the Estate filed its "Report of Appraisal" and "Final Accounting and Petition for Distribution" with the probate court. Under the heading "Other Miscellaneous Property - 706 Schedule F," both documents contained listings of the Estate's "50% Equity Interest in Johnson Amusement Parks, Inc." that were identical with the description set forth in Exhibit B to the Estate Agreement.

At some point at the end of January or beginning of February 2008,[5] the probate court approved the distribution proposed by Estate Agreement and closed the Estate. Upon the

---

[5] The record before the Court does not include the probate court's final decree of distribution. The Court notes that the Final Accounting and Petition for Distribution was filed on January 16, 2008, and the parties have stipulated that Shirley Johnson became the President of JAP on February 8, 2008.

distribution of the Estate's assets, Shirley Johnson became the owner of 50% of the outstanding and issued stock of JAP.  On February 8, 2008, Shirley Johnson became the President of JAP.

      G.     <u>The 2008 Mutual Release and Promissory Note</u>

Under the 2007 Settlement Agreement entered into by Plaintiff, Defendant, and Pamela and Michael Johnson, upon the distribution of 50% of JAP's stock to Shirley Johnson, Defendant Carl King was to make a lump sum payment of $1.5 million dollars to Shirley Johnson.  In exchange for that payment, as well as King's 50% interest in JAP, Shirley Johnson was to have transferred full ownership of CDK f/k/a JPAW to King.  Contemporaneously with these transactions, the parties to the 2007 Settlement Agreement agreed to file stipulated motions to dismiss both of the cases pending in the Ninth Judicial District – CDK's claim against the Estate of Arlyn Johnson for $1.1 million and Shirley Johnson's claim against CDK for $266,500.  As contemplated, the 2007 Settlement Agreement resolved all claims pending between the parties. Unfortunately, however, Carl King was unable to make the required $1.5 million lump sum payment and the additional transactions contemplated by the 2007 Settlement Agreement were never accomplished.  (Fodor Letter to Moffett, March 11, 2008, King Depo. Ex. 13.)

In June 2008, Shirley Johnson and Carl King, along with Shirley and Arlyn's children, Pamela and Michael Johnson, made a second attempt to resolve all issues.  The parties entered into a Mutual Release, releasing all claims between them.  The Release and the related transactions and documents provided for in the Release were essentially a "do over" of the

attempted 2007 Settlement Agreement, substituting the execution of a $1.5 million Promissory Note by King in lieu of the cash payment contemplated under the 2007 Settlement Agreement.

In consideration for the 2008 Mutual Release, King executed a Promissory Note obligating him to pay Shirley Johnson $1.5 million over seventeen months with interest of 5.75% per annum. (Promissory Note, King Depo. Ex. 16.) King was to make monthly interest payments of either $8500 or $6000 between July 1, 2008 and October 31, 2009, with the remaining principal balance due and owing on November 1, 2009. (*Id.*, ¶ 1.) The Promissory Note was secured by a Stock Pledge Agreement, pursuant to which King pledged 25% of his stock in CDK f/k/a JPAW as collateral for his obligations under the Promissory Note. (*Id.*, ¶ 9; Stock Pledge Agreement, King Depo. Ex. 17, Recital B.)

Contemporaneously with the execution of the Promissory Note and Mutual Release, Johnson and King entered into a Stock Sale Agreement, pursuant to which King transferred his 50% interest in JAP to Shirley Johnson in exchange for full ownership of CDK. (Stock Sale Agreement and Johnson Amusement Parks, Inc. Shareholder Action Without A Meeting, Dfdt.'s Ex. 1.) As a result of these transactions, King owned 100% of CDK and Shirley Johnson owned 100% of JAP.

On June 30, 2008, in accordance with the terms of the Release and upon the parties' stipulated Motion to Dismiss Case with Prejudice, the Ninth Judicial District Court in and for Teton County, Wyoming entered an order dismissing with prejudice CDK's lawsuit against the

Estate of Arlyn Johnson. (King Depo. Ex. 2.) Similarly, on July 15, 2008, in accordance with the terms of the Release and upon the parties' stipulated Motion to Dismiss Case With Prejudice, the Ninth Judicial District Court entered an order dismissing with prejudice Shirley Johnson's lawsuit against CDK and JPAW for the $266,500.00 promissory note. (Plaintiff's Ex. E.)

King made various interest payments on the Promissory Note through October 2009 but failed to pay the principal balance plus accrued and unpaid interest on November 1, 2009 as set forth in the Promissory Note's terms.[6] (Answer, ¶ 16.) Accordingly, on November 17, 2009, Shirley Johnson issued a notice of default to King. (King Depo. Ex. 18.)

H.    The Present Litigation

In December 2010, Plaintiff filed the present breach of contract action alleging King breached both the Promissory Note and the 2008 Mutual Release. Defendant counterclaimed by alleging that Plaintiff engaged in fraud and misrepresentation in the execution of the Promissory Note and Mutual Release, entitling him to a set-off of his obligations under the Promissory Note. More specifically, King alleges he ceased making payments in November 2009, upon discovering that: 1) Shirley Johnson "falsely and fraudulently claimed that she was owed $266,500 by CDK

---

[6] The principal balance on November 1, 2009, was $1,491,708.43. Johnson gave King notice of default under the Promissory Note on or about November 1, 2009, at which time she began applying the default rate of interest. As of August 8, 2011, the amount of accrued interest at the 10% interest rate totaled $270,751.04. (Schilz Aff., ¶ 7.) Accordingly, Johnson alleges that the total due as of August 8, 2011 is $1,762,459.47, plus attorneys' fees and costs, plus interest that continues to accrue at the per diem rate of $408.69. (Schilz Aff., ¶ 7.)

f/k/a JPAW prior to and during the negotiations that gave rise to the June 1, 2008 Promissory Note and Release at issue in this litigation" (Answer, ¶ 37; *see also id.*, ¶¶ 60(b), 65); and 2) "prior to June 1, 2008, JAP owned 3.95 acres of real property in Door County, Wisconsin valued at approximately $1,000,000 . . . . the existence of which was concealed by Plaintiff to hide the true value of Mr. King's 50% share in JAP and was not listed as an asset of JAP on the Estate Agreement executed by Plaintiff." (Answer, ¶ 37; *see also id.*, ¶¶ 60(a), 63-66). These same two issues also serve as the basis for Defendant's affirmative defenses of breach of fiduciary duty, fraud, misrepresentation, concealment, illegality and lack of consideration.[7] (*Id.,* ¶¶ 37-38.)

## STANDARD OF REVIEW

Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Oldenkamp v. United Am Ins. Co.*, 619 F.3d 1243, 1246 (10th Cir. 2010). An issue of fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Thomas v. Metropolitan Life Ins. Co.,* 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). A

---

[7] King's Answer also lists unclean hands, estoppel, and breach of good faith and fair dealing as additional "affirmative defenses." However, except to the extent such "affirmative defenses" are encompassed within the other defenses listed above, Defendant has not argued or come forward with any facts to support these defenses. Accordingly, the Court declines to separately consider them now.

dispute as to any material fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The movant bears the initial burden of proving that no genuine issues of material fact exist for trial. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "If this initial burden is carried, the non-movant may not rest solely on his pleadings, but must set out specific facts in support of his claims by reference to affidavits, deposition transcripts, or other exhibits incorporated therein." *Thomas v. Avis Rent A Car*, 405 Fed. Appx. 145, 151 (10th Cir. 2011) (unpublished); *Adler*, 144 F.3d at 671; Fed. R. Civ. P. 56(c). "[A] movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler*, 144 F.3d at 671. Instead, "[s]uch a movant may make its prima facie demonstration [of the absence of material fact] by pointing out to the court a lack of evidence for the nonmovant on an essential element of the non-movant's claim." *Id.* "If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial." *Id.* at 670. Because the party opposing a motion for summary judgment must set forth "specific facts" to defeat the motion, "[u]nsupported conclusory allegations ... do not create a genuine issue of fact." *L & M Enters., Inc. V. BEI Sensors & Sys. Co.,* 231 F.3d 1284, 1287 (10th Cir. 2000). Similarly, mere speculation unsupported by evidence is insufficient to resist summary judgment.

*Peterson v. Shanks*, 149 F.3d 1140, 1144-45 (10th Cir.1998).

DISCUSSION

King's counterclaim and affirmative defenses are all premised upon the allegation that the 2008 Mutual Release and Promissory Note are void and unenforceable due to the Plaintiff's wrongful conduct. More specifically, King asserts that Johnson falsely and fraudulently claimed she was owed $266,500 by CDK, when, in fact, she had already been paid with respect to that obligation through a CDK f/k/a JPAW Alpine Bank Account controlled by her daughter, Pamela Johnson.[8] In addition, King asserts that Johnson concealed JAP's ownership interest in real property valued at approximately $1 million and failed to list such real property as a JAP asset in the Estate Agreement, in order to conceal the true value of King's 50% ownership interest in JAP. Because Plaintiff Shirley Johnson was the President and controlling shareholder of JAP at

---

[8] In an effort to create a genuine issue of material fact with respect to the payment of the $266,500 promissory note, King asserts that over $1.5 million dollars in cash was deposited in JPAW's Alpine Bank account between 2002 and 2003, and that Pamela Johnson "controlled all of that cash and consistently cashed JPAW checks out on that account for large sums of money." (Opp. at 21). King notes that in a recent deposition relating to the Alpine Bank account, Pamela Johnson asserted her Fifth Amendment right against self-incrimination. From here, King leaps to the conclusion that "[w]hat is not clear, but highly likely, is that some of that cash went directly to Plaintiff Shirley Johnson to pay off debts she was owed by JPAW, Inc. and Arlyn Johnson pursuant to their 1998 divorce decree." (Opp. at 21). Notwithstanding the fact that King has had the Alpine Bank records at issue in his possession since June 2010, he offers nothing more than his own speculation to support his statement that his theory is "highly likely." Nonetheless, because the Court decides that the issue of the $266,500 promissory note's payment is barred by the doctrines of res judicata and collateral estoppel, *see discussion infra.*, any possible factual issue relating to payment of the $266,500 note is not material.

the time Plaintiff executed the 2008 Mutual Release and Promissory Note, King alleges that

Shirley's failure to disclose JAP's ownership of the Sister Bay property was a breach of the

fiduciary duties she owed to King. Finally, King alleges that the transactions were structured to

avoid tax liability and are therefore void due to illegality.

Plaintiff moves for summary judgment based on King's breach of his obligations under

the Promissory Note and Release, asserting that King's counterclaim and affirmative defenses

fail as a matter of law. Accordingly, the Court begins by addressing the grounds asserted by

King as a basis for set-off and avoidance of legal liability.[9] For the reasons set forth below, the

Court finds that King's allegations, whether couched as a counterclaim or as an affirmative

defense, fail to present a legal basis for relief and must be dismissed as a matter of law.

A.  King's Counterclaim and Defenses Regarding the Validity of Plaintiff's Prior Claim to the $266,500 Promissory Note Are Barred by the Doctrines of Res Judicata and Collateral Estoppel.

King first argues that Johnson falsely and fraudulently claimed she was owed $266,500

by CDK, when, in fact, she had already been paid with respect to that obligation through a CDK

---

[9] In addressing the issues in this order, the Court is mindful that it is Plaintiff's burden, as the movant, to first establish that there are no genuine issues of material fact with respect to her breach of contract claim. As discussed below, Plaintiff is able to meet this burden. Because King's counterclaim and affirmative defenses seek to create an issue of material fact as to the first element of Plaintiff's breach of contract claim – i.e., whether there is a lawfully enforceable contract, *see Sherer, II v. Laramie Regional Airport Bd.*, 236 P.3d 996, 999 (Wyo. 2010) – the Court focuses first on the bases relied upon by King to suggest the contract is unenforceable. In doing so, however, the Court does not misplace Plaintiff's initial burden as the movant.

f/k/a JPAW Alpine Bank Account controlled by Plaintiff's daughter, Pamela Johnson. Johnson moves for summary judgment, arguing that King is barred by the doctrines of res judicata and collateral estoppel from asserting any claims relating to the $266,500 note because that issue was fully and finally decided when the Ninth Judicial District Court dismissed litigation relating to the note with prejudice upon the parties' stipulated motion. Accordingly, Plaintiff asserts King is now barred from relitigating that issue in this Court.

"The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, 28 U.S.C. § 1738, which directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Sierra Club v. Two Elk Generation Partners, Ltd. Partnership*, 646 F.3d 1258, 1264 (10th Cir. 2011) (internal quotations and citations omitted). Accordingly, this Court must apply the preclusion rules of the State of Wyoming.

Plaintiff argues that King is barred by the doctrines of res judicata and collateral estoppel from relitigating the validity of Plaintiff's claim for payment under the $266,500 promissory note. "Res judicata bars the relitigation of previously litigated claims or causes of action as well as those that could have been litigated within the preceding action." *Hansuld v. Lariat Diesel Corp.*, 245 P.3d 293, 300 (Wyo. 2010). Under Wyoming law, "[f]our factors are examined to determine whether the doctrine of res judicata applies: (1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities

of the persons are identical in reference to both the subject matter and the issues between them."

*Eklund v. PRI Environmental, Inc.*, 25 P.3d 511, (Wyo. 2001). "Collateral estoppel bars relitigation of previously litigated issues and involves an analysis of four similar factors: (1) whether the issue decided in the prior adjudication was identical with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding." *Id.* (emphasis omitted).

Defendant's challenge to the validity of the $266,500 note is barred whether the court analyzes the facts under the res judicata or collateral estoppel analytical framework. First, with respect to the requirements of res judicata, the parties in this lawsuit are "identical" to the parties in the previous state court action. "The 'identical parties' requirement in a res judicata analysis is met when either the parties are actually the same parties to the previous proceedings, or they are in privity with those parties." *Osborn v. Kilts*, 145 P.3d 1264, 1267 (Wyo. 2006). As the sole owner and President of CDK f/k/a JPAW, Defendant Carl King is in privity with CDK and JPAW, the parties to the prior lawsuit. *See, e.g., Stoneking v. Wheatland Rural Electric Assoc.*, 72 P.3d 272, 275 (Wyo. 2003) (upholding district court's determination that company was in privity with its president and manager). Additionally, both the issues and the subject matter

raised by way of the state district court litigation and the Defendant's counterclaim and defenses

in this matter are identical. In the Ninth Judicial District Court, Plaintiff sought recovery on an

allegedly outstanding promissory note in the amount of $266,500 owing from King's company,

CDK. The argument that serves as a basis for King's counterclaim and defenses in this matter –

i.e., that the CDK note had already been paid – was a defense that was both available and actually

asserted by CDK in the Ninth Judicial District. In fact, King notes that CDK and JPAW

"asserted a number of defenses, including failure of the Plaintiff to state a claim of relief under

Rule 12(b)(6) and fraud." (Opposition at 11.) King asserts:

> The backdrop of these defenses was a belief by the Defendants that either the
> $266,500 Note was fraudulent or had been paid in full. No express defense of
> 'payment' needed to be made. Rather, if proof of payment in full were uncovered
> during discovery, then certainly Defendants' [sic] would have been successful
> relative to their defenses of 'failure to state a claim for relief' and 'fraud'.

(Id. at 12.) Given these admissions, King, not surprisingly, makes no attempt to even argue that

there is not identity of issues or subject matter. Similarly, with respect to factor four, the parties'

capacities are identical in reference to both the issues and subject matter between them. As noted

above, King is the sole owner and president of CDK f/k/a JPAW, and Shirley Johnson is the

named Plaintiff for both actions. Their capacities with respect to the issues and subject matter

between them remains unchanged.

Turning to the prerequisites of collateral estoppel, the Court concludes that they are met,

as well. As discussed above, with respect to factors one and three, the issue decided in the prior

adjudication is identical to the issue presented in the this action, and the party against whom

collateral estoppel is asserted – i.e., Defendant Carl King – is in privity with CDK f/k/a JPAW,

the parties to the prior litigation.  Additionally, the parties' stipulated dismissal of the prior

litigation with prejudice was an adjudication on the merits.  "[A] dismissal with prejudice

operates as an adjudication on the merits and precludes subsequent action." *Rawlinson v.

Wallerich*, 132 P.3d 204, 207 (Wyo. 2006).  Although the Wyoming Supreme Court has held that

a voluntary dismissal without prejudice may not always serve as an adjudication on the merits for

purposes of collateral estoppel (as opposed to res judicata), it has recognized an exception where

"it is clearly shown that the parties intended that the issue be foreclosed in other litigation."

*Eklund*, 25 P.3d at 518 (citing rule announced by "[o]ther authorities" but declining to apply it

where facts failed to demonstrate that party intended to be foreclosed from contesting any issue

involved in prior litigation in a subsequent action); *see also Amoco Prod. Co. v. Bd. of Cnty.

Comm'rs.*, 55 P.3d 1246, 1250-51 (Wyo. 2002).  The prior litigation involved but a single issue –

the validity of Plaintiff's claim to an outstanding balance on a $266,500 promissory note

executed by CDK f/k/a JPAW.  In choosing to settle that case and seek dismissal with prejudice,

there can be no question that the parties intended the issue to be foreclosed from future litigation.

Finally, although King argues that he did not have a full and fair opportunity to litigate

the validity of the $266,500 note in the Ninth Judicial District Court, he offers little support for

this argument beyond his own self-serving assertion.  In fact, King's efforts to describe how and

why his investigation of this claim was either hindered or unproductive establishes exactly the opposite.[10]   The action was pending for more than two and one-half years, CDK f/k/a JPAW raised affirmative defenses in that litigation that are identical to King's claim and defenses in this matter, and the parties conducted significant discovery before jointly moving to dismiss the matter with prejudice.

Equally unavailing is King's reliance on W.R.C.P. 26(e) to suggest that certain information should have been provided by Plaintiff in supplemental discovery responses.  First, and most importantly King has failed to detail how, specifically, Plaintiff's discovery responses were in any way deficient.[11]   Additionally, King provides no support for the position that a party

---

[10] For example, King submits affidavits and exhibits that he claims demonstrate his efforts to obtain financial information regarding JAP and JPAW from accountant Joe Schilz. Nothing in these documents demonstrates that Schilz, or anyone acting on Johnson's behalf, withheld requested information.  To the contrary, CDK's attorney, Paul Perla states in his affidavit that in response to his requests, Schilz provided him with "a considerable amount of tax return information."  (Perla Aff., ¶ 9.)  Even if Schilz did withhold requested information, however, CDK's decision to "concentrat[e] on negotiating and drafting a mutually agreeabl[e] settlement," (Defendant's Opposition at 14), as opposed to insisting on discovery of information it believed was necessary to defend against Johnson's claims appears to have been a tactical decision and knowing abandonment of rights it had in the underlying litigation.

[11] In her initial responses to CDK's Requests for Production of Documents seeking documents "related to any payments made . . . in satisfaction of the [$266,500] Promissory Note," Shirley Johnson indicated that Pam (a non-party) had these documents.  In supplemental correspondence regarding the discovery requests, Plaintiff's lawyer clarified that "Mrs. [Shirley] Johnson does not have any documents that are responsive to this.  We are attempting to obtain those documents from Pam Johnson. . . . I do not have control over when Pam will provide these but she indicated that she would as soon as she is able."  (Brett King Letter to Stefan Fodor, May 12, 2006, Dfdt.'s Ex. 12.)  Although Plaintiff indicated that she would seek responsive

must continue to supplement discovery responses even after the parties have focused their efforts on settlement and those efforts have resulted in a settlement of all claims.  Finally, although King cites his own difficulties obtaining Alpine Bank records from non-parties Alpine Bank and Pamela Johnson, he fails to establish either that this is the fault of Plaintiff Shirley Johnson or that the decision not to pursue discovery of these documents (for example through third party subpoenas, depositions, and motions to compel, if necessary)  was anything other than a knowing and deliberate choice on his part.  There can be no question that CDK f/k/a JPAW and King had a full and fair opportunity to litigate the validity of the $266,500 promissory note in the prior suit.  If, as King claims, the documentation he sought then (but apparently did not receive) provides the proof he needs to challenge the validity of Plaintiff's claim to an outstanding balance, he has no one to blame but himself for not insisting on receiving it before entering into a settlement agreement.  Essentially, King asks this court to undo the "with prejudice" component of the previous settlement, because he now believes he has evidence to back up the position he took in the prior litigation.  If a litigant could avoid the preclusive effect of a prior dismissal with prejudice by simply alleging he received deficient discovery responses (including allegedly deficient responses to requests for discovery from non-parties), the policies underlying the doctrines of res judicata and collateral estoppel would never be served.

---

documents from Pamela Johnson, a non-party, she cannot be held responsible for not producing documents she did not possess herself.

C.    King has no Valid Counterclaim or Defenses Based on Plaintiff's Alleged Failure to Disclose JAP's Ownership of Real Property Located in Door County, Wisconsin.

The second basis underlying both King's counterclaim and his affirmative defenses is a claim that Plaintiff misrepresented the assets owned by JAP prior to the execution of the 2008 Mutual Release and related documents. More specifically, King claims that Plaintiff concealed JAP's ownership of real property associated with an amusement park located in Sister Bay, Wisconsin valued at approximately $1 million. For a variety of reasons, this claim fails as a matter of law.

i.    King Disclaimed Any Interest in Any JAP Assets Other than the Flat Creek Inn and Mart and CDK f/k/a JPAW.

King claims that Plaintiff misled him as to the value of JAP's assets prior to entering the 2008 Mutual Release and related documents. The most fundamental problem for King in making this assertion is the fact that he expressly disclaimed any right to JAP assets other than those relating to the Flat Creek Inn and Mart and CDK f/k/a JPAW. (King Depo. Ex. 5, ¶ 5.) As discussed in some detail above, King's purchase of JAP was designed to put him back in the position he and Melvin Johnson intended when they negotiated the sale of Melvin's interest in the Flat Creek Inn and Mart (JPAW) in August 2005. By virtue of his counterclaim and defenses in this litigation, King attempts to turn this corrective stock sale agreement into a $1 million winning lottery ticket.

As set forth in the stock purchase agreement, this second agreement was necessary to

accomplish "the previous attempted sale of JPAW, Inc. stock" when "[t]hat transaction was called into question based on the reasoning that [Melvin] Johnson did not personally own stock in JPAW, Inc. as JPAW, Inc. was a wholly owned subsidiary of JAP, Inc." (King Depo. Ex. 5.) The agreement itself notes that the sale of Melvin's 50% ownership interest in JAP is made on those terms set forth in the stock purchase agreement. The stock purchase agreement contains a provision entitled "Disgorgement of Profits" in which King expressly agreed to "disgorge his share of any distribution by JAP, Inc. realized from the operation or sale of any assets of JAP, Inc. *with the exception of any profits realized from the operation or sale of CDK, Inc. formerly known as JPAW, Inc. or from the operation or sale of the Flat Creek Inn & Mart located in Jackson, Wyoming.*" (King Depo. Ex. 5) (emphasis added). The amount paid by King for the 50% ownership interest in JAP was "all inclusive in the 700 to 750 thousand dollars" King paid for JPAW in August 2005. (King Depo. at 51.). In other words, King paid nothing more for the 2007 purchase of Melvin's JAP stock than he had already committed to pay for the previously-negotiated purchase of Melvin's share of JPAW.[12]

Nonetheless, although King acknowledges he entered into this transaction "to buy CDK," (King Depo. at 86), he lays claim, in this lawsuit , to JAP assets that had nothing whatsoever to

---

[12] Again, the "700 to 750 thousand dollars" King paid Melvin for JPAW included a cash payment of either fifty or one hundred thousand dollars. The remaining balance of the "purchase price" consisted of King's agreement that CDK f/k/a JPAW would repay its outstanding loan obligations to Melvin. (King Depo. at 20, 22-23.)

do with the operation or sale of the Flat Creek Inn and Mart and CDK f/k/a JPAW.   He attempts

to explain away the disgorgement provision of the stock purchase agreement by stating that he

"didn't know there were any other assets."  (King Depo. Ex. 5 at 86-87.)  Whether King was

aware of other JAP assets is irrelevant.[11]  The plain language of the contract through which he

purchased his interest in JAP expressly disclaimed any right to profits relating to JAP assets other

than CDK f/k/a JPAW.  Thus, any claim against Plaintiff based on the failure to disclose such

assets fails as a matter of law.

      ii.     The Sister Bay, Wisconsin Real Estate was Disclosed in the Estate
               Agreement

King claims that he relied on Exhibit B to the Estate Agreement to provide the valuation

underpinning the $1.5 million purchase price he agreed to pay in the 2007 Settlement Agreement

and the subsequent Promissory Note.[12]  In particular, King asserts that the omission from Section

1.01(a)(1) of the Estate Agreement, which purports to identify the real property owned by JAP in

Sister Bay, Wisconsin and includes the property's legal descriptions and tax ID, is not

---

[11] Or perhaps, more accurately, it is precisely the point.  King had no need to be aware of other JAP assets because the deal with Melvin was designed to accomplish only the previously attempted purchase of Melvin's interest in JPAW.

[12] King acknowledges that the decision to rely upon the Estate Agreement for valuation was a decision he reached with the advice of counsel.  (Answer, ¶ 62) ("Counsel for both parties agreed that reliance upon the Estate Agreement was an appropriate method of valuation of JAP, given that only very limited records relevant to JAP's assets had been provided to Mr. King prior to June 1, 2008.")

insignificant.  Further, King notes that although Exhibit B identifies the vacant lots owned by JAP as "Vacant Real Estate," the amusement park property is identified only as the "Sister Bay, Wisconsin Amusement Park," suggesting that the asset listed is only the amusement park business, as opposed to the improved real property, inclusive of the business.  King asserts that this belief was reasonable in light of the way the CDK f/k/a JPAW was owned and operated, with the Flat Creek Inn and Mart business and improvements being owned by CDK, while the real property on which it was located was leased from another entity.[12]

In response, Johnson asserts that although the amusement park property was not listed separately under Section 1.01(a)(1) of the Estate Agreement, it was sufficiently identified in Exhibit B to the Estate Agreement, as well as two other subsequent pleadings (the "Report of Appraisal" and the "Final Accounting and Petition for Distribution") filed before the probate court.  The Court agrees that the listing set forth in Exhibit B identified the property at issue.  On the first page of the Estate Agreement, the parties to the Estate Agreement agreed that "the Estate knows of and *is administering those assets (collectively "the Assets") identified in Exhibit B*, which Exhibit is incorporated and made a part hereof by reference[.]" (King Depo. Ex. 11) Given the fact that the amusement park property was disclosed in Exhibit B to the Estate Agreement – the very agreement King alleges he relied upon to determine the value of JAP's

_____

[12] King relies upon certain representations of Melvin Johnson in this regard.  As Plaintiff aptly points out, however, King has not asserted, nor is there any evidence to suggest that Melvin was Shirley Johnson's agent for purposes of these representations.

assets and to determine the amount of the Promissory Note made to Plaintiff – the Court finds that the property was disclosed. King's assertions to the contrary are unavailing.

Further, even if Exhibit B failed to properly identify the Sister Bay Amusement Park as a "real property" asset, the Court fails to see the import such a failure has with respect to the asset's valuation. In the end, it is the *value* of JAP's assets and counterclaims that is significant for purposes of King's counterclaim and affirmative defenses, as opposed to its character as real property. King does not dispute that Exhibit B identifies an asset of JAP as being the "Sister Bay, Wisconsin Amusement Park" with an assessed value of approximately $800,000. This listed assessed value coincides with the combined valuation of the real property and the improvements thereon as identified in the Door County tax assessments. (Pl. Ex. A) (listing a total estimated fair market value of $797,000 for both the land and improvements). Accordingly, whether the asset corresponding to the amusement park was identified on Exhibit B as real property or referred to the business and improvements located thereon, the Court finds is a distinction without any material difference.

                      iii.    Plaintiff Made No Representations to King Regarding the Listing of JAP's Assets in the Estate Agreement.

Even if, however, there was a genuine issue of material fact as to whether the Sister Bay, Wisconsin amusement park was disclosed in the Estate Agreement, Plaintiff made no representations to King regarding the listing of JAP's assets in the Estate Agreement. King acknowledges that he has never met Plaintiff and that he never personally requested information

from Plaintiff or her accountant. (King Depo. at 13, 24-25.)[13] Although King argues that the misrepresentations in this case were made through Plaintiff's agents, King confuses the role of various parties with respect to the settlement of Arlyn Johnson's Estate. King notes that in 2005, his attorney, John Paul Perla, "communicated with Joe Schilz, certified accountant for Shirley Johnson, Pam Johnson, and others, on a number of occasions in an attempt to obtain the financial and tax records for JPAW, Inc. and JAP, Inc. so that the debts and liabilities of these interwoven companies could be uncovered." (Dfdt.'s Opp. at 12.) Among the unlisted "others" for whom Schilz served as an accountant were Arlyn Johnson and the Estate of Arlyn Johnson. (Schilz Aff., ¶ 3.) In fact, Perla's own affidavit, which was submitted by Defendant, indicates that "[i]t was Michael Cramer [the Estate's Personal Representative] who told me about Joseph Schilz and he told me to call Schilz regarding tax issues for JPAW Inc. and/or Johnson Amusement Parks." (Perla Aff., Dfdt.'s Ex.7, ¶ 6.)

      iv.     King's Breach of Fiduciary Duties Defense Fails As a Matter of Law

Irrespective of what information was contained in the Estate Agreement, King asserts that beginning on February 8, 2008, Plaintiff, as President and controlling shareholder of JAP, owed certain fiduciary duties to King requiring her to disclose the "facts" at issue. More specifically, King asserts that Plaintiff breached those duties by failing to affirmatively disclose that she had been paid previously on the $266,500 promissory note and that JAP owned the Sister Bay

---

[13] King does contend that his agents requested information from Plaintiff's accountant.

amusement park before entering into the 2008 Mutual Release and Promissory Note. King's

argument appears to be less that Johnson breached her fiduciary duties than that Johnson's agents

failed to perform them for her; however, King has advanced no viable legal authority to support

an application of fiduciary duties under these circumstances.[14]

       Even if there was a basis for applying fiduciary duties in this context, King's arguments

necessarily fail. First, with respect to any claim relating to disclosure of JAP's interest in the

Sister Bay, Wisconsin amusement park property, as discussed above, King's ownership of a 50%

interest in JAP was subject to a disgorgement provision limiting his interest to those profits

arising from the operation or sale of CDK, Inc. and the Flat Creek Inn and Mart. (King Depo.

Ex. 5, ¶ 5.) Accordingly, since King had no legal claim to JAP's interest in anything other than

CDK f/k/a JPAW, he has no claim that Johnson breached any fiduciary duties by "failing to

---

[14] King asserts:

      As agents for Plaintiff, Attorney Moffett and CPA Joe Schilz had duties to
      Plaintiff to see that her fiduciary duties to Defendant were fulfilled. Plaintiff
      (principal) is responsible for the acts of her agents (Attorney Moffett and CPA Joe
      Schilz). Even where the Plaintiff may not have known about any concealment,
      which was apparently orchestrated by her agents, where a principal seeks to retain
      the benefits of the transaction or fraud, she is charged with the agents knowledge.

(Opp. at 7) (citation omitted). In support of this assertion, King cites the Court to general
principals of agency law as opposed to anything relating to a principal's liability for the agent's
breach of the principal's fiduciary duties. Further, the Court notes that there is no mention of
"breach of fiduciary duties" in King's counterclaim. Instead, the only mention of fiduciary duties
is a one-line reference under the heading of "Affirmative Defenses." (Answer, ¶ 38.)

disclose" JAP's ownership interest in the Sister Bay amusement park property. Second, with respect to any alleged breach of fiduciary duty relating to or arising out of payment on the $266,500 note, as discussed above, this argument is barred by the doctrines of res judicata and collateral estoppel.

        v.        King's Illegality Defense Fails As a Matter of Law

Similarly unavailing is King's argument that the contracts at issue are illegal and therefore, unenforceable. More specifically, King asserts that the contracts at issue were structured to defraud the United States government[15] through tax evasion.[16] King alleges this was accomplished first, through the cancellation of King's $1.1 million claim against the Estate of Arlyn Johnson without tax consequences to the Estate, and second, through the avoidance of

---

[15] King initially asserted that the deals were illegally structured by Johnson's agents Moffett and Schilz; however, King beat a hasty retreat at least as it pertained to attorney Moffett. Shortly after submitting his Opposition brief, King filed a "Supplement and Clarification to Defendant's Opposition to Plaintiff's Motion for Summary Judgment" in which he stated that he presently had "no information or evidence that would implicate Attorney Moffett in any scheme or plan to defraud the Internal Revenue Service, nor to consciously assist the Plaintiff in any plan or scheme to avoid paying any legally required taxes to the Internal Revenue Service." (Supplement and Clarification at 2.) King's willingness to play fast and loose such troubling allegations has not gone unnoticed by this court.

[16] Although the facts of these transactions are nothing new, King raises the alleged illegality of these agreements for the first time in litigation seeking repayment of his debt. In fact, the record demonstrates that King's own counsel was mindful of tax issues at the time the agreements were negotiated. (Fodor Letter to Moffett, August 7, 2007, King Depo. Ex. 8) ("Carl King would then convey his 50% interest in JAP, Inc. to the Estate and withdraw his claim against the Estate *thereby eliminating any tax consequence to the Estate on that claim*.") (emphasis added).

capital gains taxes by JAP.[17]  As Johnson points out, however, any issue relating to either entity's

obligation to pay taxes is an issue to be taken up with the Estate and JAP, respectively.  To the

extent that there is anything problematic with those entities' tax treatment of any of the

transactions at issue, that is a matter for the IRS to determine.  Further, King fails to provide the

Court with any authority demonstrating his standing to raise either issues in this litigation and

consequently evade enforcement of his obligations. Accordingly, the Court determines that the

tax consequences of the referenced transactions is a matter outside the scope of this litigation and

not available to King to now avoid enforcement.

      C.      <u>King's Claims Regarding JAP's Assets and the Validity of the $266,500
Promissory Note Have Been Released.</u>

Having determined that none of King's challenges to the enforceability of the Mutual

Release and Promissory Note withstands scrutiny, the Court finds that King's counterclaim and

affirmative defenses are barred by his execution of the 2008 Mutual Release.  The 2008 Mutual

Release provides that Plaintiff and Defendant "mutually discharge, release and remise any and all

claims or causes of action, whatsoever, in law, admiralty or equity which any of the parties to this

release, whether individually or jointly, it [sic] ever had or now or have or hereinafter can, shall

---

[17] Notably, although King now challenges the legality of these transactions in litigation
seeking payment on his debt associated therewith, the record indicates that the tax benefits of
various transactions was an issue raised by his own counsel when the agreements were first
negotiated.  (Fodor Letter to Moffett, August 7, 2007, Pl. Ex. 8) ("Carl King would then convey
his 50% interest in JAP, Inc. To the Estate and withdraw his claim against the Estate *thereby
eliminating any tax consequences to the Estate on that claim*.") (emphasis added).

or may have against each other . . . ." (Dfdt.'s Ex. 15.) The consideration recited for the Mutual Release included the Promissory Note and related documents. The 2008 Mutual Release and Promissory Note were a second release of all claims among the parties and differed from the 2007 Settlement Agreement only in terms of modifying the payment terms of King's $1.5 million obligation to Johnson. The 2007 Settlement Agreement and 2008 Mutual Release were the negotiated and voluntary, agreed-upon resolution of three lawsuits: 1) CDK's lawsuit against the Estate of Arlyn Johnson; 2) Plaintiff's lawsuit against CDK for the $266,500 note; and 3) the probate of Arlyn Johnson's Estate. Accordingly, King has twice released all of his claims against Johnson, including claims relating to the value of JAP's assets and the $266,500 note. As a result, King's counterclaim must be dismissed as a matter of law.

Johnson cites the court to the Ninth Circuit's recent decision in *The Facebook, Inc. v. Pacific Northwest Software, Inc., et al.*, 640 F.3d 1034 (9th Cir. 2011). In the *Facebook* case, the Ninth Circuit upheld the district court's enforcement of a settlement agreement between Facebook and Cameron and Tyler Winklevoss and Divya Narendra (collectively, "the Winklevosses"). In that case, the Winklevosses argued that Facebook misled them during settlement negotiations into believing that its shares were worth about four times as much as they actually were. The Winklevosses asserted that had they known the true value of the Facebook shares, they would have never agreed to the settlement agreement. The Winklevosses asserted that Facebook violated Rule 10b-5 of the Securities Exchange Act of 1934 and that pursuant to

Section 29(b) of the act, the Settlement Agreement was therefore voidable, entitling them to rescission. Relying on case law in the 10b-5 context and the factual circumstances surrounding the settlement negotiations, the Ninth Circuit observed that the Winklevosses faced a "steep uphill battle" in seeking to rescind the settlement agreement. *Id.* at 1039. With respect to the issue of the stock's valuation, the Ninth Circuit went on to note the differences between parties who reach an agreement in the context of litigation and those who enter an investment relationship in the open market:

> Parties involved in litigation know that they are locked in combat with an adversary and thus have every reason to be skeptical of each other's claims and representations. They can use discovery to ferret out a great deal of information before even commencing settlement negotiations. They can further protect themselves by requiring that the adverse party supply the needed information, or provide specific representations and warranties as a condition of signing the settlement agreement.

*Id.* at 1039 (internal citations omitted). Although these observations were made by the Ninth Circuit in the precise factual context at issue in that case (i.e., contrasting securities valuation on the open market with valuation settled upon through litigation), the principles stated therein are not necessarily limited and may have broader application with respect to negotiations to settle any ongoing litigation. Similarly, with respect to the Winklevosses' claims that Facebook's allegedly fraudulent misrepresentations warranted setting aside the settlement agreement, the Court noted:

> An agreement meant to end a dispute between sophisticated parties cannot reasonably be interpreted as leaving open the door to litigation about the

> settlement negotiation process. A release in such an agreement would be useless
> to end litigation if it couldn't include claims arising from the settlement
> negotiations.

*Id.* at 1040.  This reasoning has even greater application in the context of a case such as this, where the alleged "fraud" relied upon to set aside the Release relates to the underlying merits of the claim that was settled.  If King's position in this litigation were accepted, it would allow a party to reopen any settled litigation if he later discovered evidence bolstering his prior litigation position.  If a party was able to undo a binding settlement agreement by simply couching the prior litigation as "fraudulent," there would be no way to assure the full and final resolution of any matter.

    D.    <u>King's Request for Additional Discovery Under Fed. R. Civ. P. 56(d) is Both Insufficient and Dilatory</u>

Apparently recognizing the scant evidentiary support for his position, King moves, in the alternative, for additional time to conduct discovery pursuant to Fed. R. Civ. P. 56(d).  King asserts that there are material facts in dispute regarding whether Plaintiff's claim regarding the $266,500 note was fraudulent and whether it was used by Johnson as leverage to pressure King into executing the settlement documents in 2007 and 2008.  He asserts that he has been unable to pin down the facts on this issue due to Johnson's refusal to answer discovery requests and Pamela Johnson's assertion of her Fifth Amendment right against self-incrimination.  (Exhibit 15 to Defendant's Opposition at 3-4.)  As noted above, King's claims regarding the $266,500 note are barred by the doctrines of res judicata and collateral estoppel.  Even if King's claims were not

barred, however, the Court would not be inclined to grant King a summary judgment continuance under Fed. R. Civ. P. 56(d).

Rule 56(d) provides:

(d) **When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1) defer considering the motion or deny it;
(2) allow time to obtain affidavits or declarations or to take discovery; or
(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). "A party may not invoke Rule [56(d)][18] by simply stating that discovery is incomplete but must state with specificity how the additional material will rebut the summary judgment motion." *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1179 (internal quotation omitted). Although courts freely grant relief under Rule 56(d) where "a summary judgment motion is filed . . .early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case," *Burlington Northern Santa Fe R.R. Co. v. The Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana,* 323 F.3d 767, 773-774 (9th Cir. 2003), Rule 56(d) "does not compel the court to grant a continuance to a party that has been dilatory in conducting discovery." *Garcia*, 533 F.3d at 1179 (denying summary judgment continuance where discovery had been underway for six months at the time of the request).

---

[18] The provision for obtaining a summary judgment continuance was previously set forth at Fed. R. Civ. P. 56(f). Effective December 1, 2010, the rule was moved to subdivision (d) of Rule 56 without substantial revision.

To say that King has been dilatory with respect to discovering the facts at issue is a colossal understatement. This dispute, relating to payment on the $266,500 promissory note, has been ongoing for nearly six years. As noted above, although King takes issue with the adequacy of Plaintiff's discovery responses in the both the Ninth Judicial District Court and this court, he has never sought relief from this court, despite ample opportunity to do so. King has had the Alpine Bank records at the heart of this issue since June 20, 2010. (Dfdt.'s Ex. 8, ¶ 11.) This lawsuit had been pending for more than seven months, the full discovery period had run its course, and Plaintiff's motion for summary judgment was fully briefed before this issue was ever brought to the court's attention. Like so many of King's problems in this litigation, his failure to obtain the information he now seeks is one of his own making. Accordingly, his motion for a continuance of discovery under Fed. R. Civ. P. 56(d) and his companion motion to compel are both **DENIED.**

      E.      <u>Plaintiff is Entitled to Summary Judgment on Her Breach of Contract Claims</u>

"The elements for a breach of contract claim consist of a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages." *Scherer, II v. Laramie Regional Airport Bd.*, 236 P.3d 996, 999 (Wyo. 2010) (quoting *Reynolds v. Tice*, 595 P.2d 1318, 1323 (Wyo. 1979)). Here King has admitted that he executed the Mutual Release and Promissory Note. (King Depo. at 99-100.) He has further admitted that he failed and refused to pay the principal and outstanding interest on the

Promissory Note due on November 1, 2009. (Answer, ¶ 16.) Additionally, King has not disputed the calculation of Plaintiff's damages based upon the terms of the Promissory Note, totaling $1,762, 459.47 as of August 8, 2011, plus interest that continues to accrue at $408.69 per day. Having satisfied each of the elements of her breach of contract and finding no genuine issues of material fact exist, Plaintiff is entitled to judgment as a matter of law, and her motion for summary judgment is **GRANTED.**

CONCLUSION

WHEREFORE, for the reasons set forth more fully above, Plaintiff's Motion for Summary Judgment [Doc. 67] is **GRANTED.**

**IT IS SO ORDERED.**

Dated this __17th__ day of October, 2011.

UNITED STATES MAGISTRATE JUDGE